1

THE HONORABLE JOHN C. COUGHENOUR

2
3
4
5
6
7
8
9
10
11
12
13

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

PETER B., individually and as guardian of
M.B., a minor

     Plaintiff,

vs.

PREMERA BLUE CROSS, MICROSOFT
CORPORATION, and MICROSOFT
CORPORATION WELFARE PLAN,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 2:16-cv-01904-JCC

**PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT**

**NOTE FOR MOTION
CALENDAR: OCTOBER 13, 2017**

**ORAL ARGUMENT REQUESTED**

14

15      Plaintiff Peter B., individually and as guardian of M.B., a minor, through his undersigned

16 counsel and pursuant to F.R.C.P. 56, submits the following Motion for Summary Judgment.

17 **INTRODUCTION**

18      Peter B. brought this lawsuit to recover expenses incurred during his son M.B.'s treatment at

19 Daniels Academy ("DA") that PBC improperly refused to cover. PBC covered treatment from January

20 1, 2015, when M.B. was admitted to DA, through March 11, 2015. PBC asserted that M.B.'s treatment

21 after March 11, 2015, was not medically necessary because the plan covers only a short-term stay, 90

22 days or less, and that DA did not initiate discharge planning early in the treatment. PRE_BER001377.

23 Peter B. appealed PBC's decision and PBC upheld the denial, providing a different rationale for its

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT-1**
Case No. 2:16-cv-01904 JCC

**THE WOOD LAW FIRM, PLLC**
800 Fifth Avenue, Suite 4100
Seattle, WA 98104
206-447-1342; 206-577-5380 (fax)

1    decision. Specifically, PBC argued that M.B.'s treatment was not medically necessary because "he has

2    not shown evidence of consistent improvement." PRE_BER000033. Peter B. requested an external

3    review, and the external reviewer upheld the denial, changing the rationale again. The external

4    reviewer applied acute inpatient criteria instead of residential criteria for continued stay.

5    PRE_BER000935-939.

6         M.B. suffered mental health issues throughout his childhood, which ultimately led to his

7    admission at DA residential treatment. M.B. began exhibiting obsessive behavior and unusual fears

8    before the age of three. PRE_BER000054. M.B. was diagnosed with Asperger's Syndrome in the first

9    grade, and, in the fourth grade he began suffering from Obsessive Compulsive Disorder symptoms.

10   PRE_BER000055-56. M.B.'s mental health deteriorated throughout his childhood and early

11   adolescence, despite his parents' best efforts to get him the help he needed. M.B.'s behavior became

12   intolerable for the entire family. M.B. became aggressive where he would punch and grab his mother

13   leaving her bruised, verbally threaten his younger sisters and destroy family property.

14   PRE_BER000060-65. Residential treatment was the only treatment option for M.B., after years of

15   unsuccessful outpatient treatment.

16        This Court should reverse PBC's denial of coverage for M.B.'s residential treatment because

17   the denial was not justified by the terms of the Plan. PBC engaged in shifting rationales for the denial

18   of benefits, indicating that PBC was determined to deny coverage for M.B.'s residential treatment

19   regardless of the arguments Peter B. provided in his appeals. In addition, PBC violated ERISA claim

20   procedures when it failed to provide Peter B. with a full and fair review of his claim.

21                    **PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

22        1.      Peter B. is a natural person residing in the State of Washington. M.B. is Peter B.'s son.

23        Complaint, ¶ 1; docket #2; Answer, ¶ 1, docket #24.

---

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT-2**      **THE WOOD LAW FIRM, PLLC**
Case No. 2:16-cv-01904 JCC                          800 Fifth Avenue, Suite 4100
                                                    Seattle, WA 98104
                                                    206-447-1342; 206-577-5380 (fax)

1      2.      Peter B. is employed by Microsoft, which provides the Plan for its employees and their

2  dependents. Peter B. is a participant in the Plan and M.B. is a beneficiary of the Plan. Complaint, ¶

3  2; Answer, ¶ 2.

4      3.      The Plan is governed by ERISA. Complaint, ¶ 6; Answer, ¶ 6.

5  **The Terms of the Plan**

6      4.      Both the 2015 and the 2016 Summary Plan Descriptions ("SPDs") include coverage for

7  outpatient and inpatient treatment of mental health conditions with a higher level of coverage for

8  care from an in-network provider. PRE_BER000760[1]; PRE_BER000835.

9      5.      Skilled nursing services in connection with care for physical illness or injury is covered

10 on both and in and out-of-network basis and is limited to a period of 120-days per year.

11 PRE_BER000786; PRE_BER000860-861.

12     6.      The Plan outlines criteria to determine whether care is medically necessary and states:

13 **Medically necessary** - A covered service or supply that meet certain criteria including:

14     ●It is essential to the diagnosis or treatment of an illness, accidental injury, or condition that is
15 harmful or threatening to the enrollee's life or health unless it is provided for preventive services when
16 specified as covered under this plan.
17
18     ●It is appropriate for the medical condition as specified in accordance with authoritative
19 medical or scientific literature and generally accepted standards of medical practice.
20
21     ●It is a medically effective treatment of the diagnosis as demonstrated by the following
22 criteria:
23                 * There is sufficient evidence to draw conclusions about the positive effect of
24                 the health intervention on health outcome.
25                 * The evidence demonstrates that the health intervention on health outcomes
26                 outweigh the expected harmful effects of the health intervention.
27                 * The expected beneficial effects of the health intervention on health outcomes
28                 outweigh the expected harmful effects of the health intervention.
29

---

[1] A complete copy of the pre-litigation claim file and appeal record is being submitted by the Defendants as Exhibits to their Motion for Summary Judgment. Citations herein are to that record, utilizing their Bates-stamped page numbers.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT-3       **THE WOOD LAW FIRM, PLLC**
Case No. 2:16-cv-01904 JCC       800 Fifth Avenue, Suite 4100
       Seattle, WA 98104
       206-447-1342; 206-577-5380 (fax)

●It is cost-effective, as determined by being the least expensive of the alternative supplies or levels of service that are medically effective and that can be safely provided to the enrollee.  A health intervention is cost-effective if no other available health intervention offers a clinically appropriate benefit at a lower cost.

●It is not primarily for research or data accumulation.

●It is not primarily for the comfort or convenience of the enrollee, the enrollee's family, the enrollee's physician or another provider.

●It is not experimental or investigational.

●It is not recreational, life-enhancing, relaxation or palliative therapy, except for treatment of terminal conditions.

For these purposes, "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer-reviewed medical literature that is generally recognized by the relevant medical community, Physician Specialty Society recommendations, the views of physicians practicing in relevant clinical     areas, and any other relevant factors.

PRE_BER000822; PRE_BER000926.

**PBC's "Utilization Management Guideline"**
**for "Behavioral Health: Psychiatric Residential Treatment"**

7.      PBC has developed detailed guidelines to assist it in evaluating the medical necessity of residential treatment for a covered patient. PRE_BER000743-748.

8.      For admission to residential treatment the Plan requires meeting its residential treatment admission criteria. PRE_BER000743-744.

9.      M.B. met the Plan's admission criteria for residential treatment because PBC covered M.B.'s treatment from the time of his admission on January 1, 2015 through March 11, 2015. PRE_BER001377.

10.     First, at least one of the following criteria for residential continued stay must be met:

a.      Significantly impaired functioning or behavioral dyscontrol continues to be present at a severity that requires 24/7 containment and treatment, or continued repetitive harm to self or others or active risk of harm to self or others continues to be present at a severity that requires 24/7 containment and treatment, or sufficient stabilization for partial hospitalization or outpatient treatment has still not

occurred following step-down from inpatient treatment or treatment in a crisis stabilization facility. However, clinical progress must also be evident. If the stay reaches thirty days without clinical progress, then beginning improvement must be evident within an additional seven days, followed by observable clinical progress in symptom reduction, functional improvement, or improvement in behavioral control every seven to ten days. Increased participation in treatment, increased attendance at treatment activities, increased compliance with treatment recommendations, increased compliance with facility/program rules, increased completion of assignments, increased "openness," building trust, increased discussion of problems or issues, increased insight, exploring or working on past or present issues, improving relationships, or similar processes, are not considered to be clinical progress in the absence of symptom reduction, functional improvement, or improvement in behavioral control.

      b.     Sufficient stabilization for partial hospitalization or outpatient treatment has occurred, but a very brief additional period (five to seven days) of residential treatment is indicated (1) to ensure that stabilization can be maintained without significant decompensation or (2) to secure an appropriate living placement for a patient who will rapidly decompensate and be re-admitted if not discharged directly to such placement.

      c.     Maximum likely improvement has been achieved, there is little likelihood of further clinical improvement with continued residential treatment, but a very brief additional period (five to seven days) of residential treatment is needed to secure an appropriate placement for a patient who will rapidly decompensate and be re-admitted if not discharged directly to such placement.

      d.     Little or no improvement has been achieved, there is little likelihood of clinical improvement with continued residential treatment services, but a very brief additional period (five to seven days) of residential treatment in needed to secure an appropriate placement for a patient who will rapidly be readmitted if not discharged directly to such placement.

      11.     The Plan requires additional criteria for continued stay and requires all of them must be met. PRE_BER000744-746.

      12.     The Plan also provides criteria for inpatient treatment at a licensed psychiatric hospital. PRE_BER000140-144.

      13.     The Plan requires meeting all of the criteria regarding intensity of service for admission and continued stay at a residential treatment facility. PRE_BER000746-748.

**M.B.'s Treatment History**

      14.     M.B. was diagnosed with Asperger's Disorder ("AD") and obsessive-compulsive disorder ("OCD") at a relatively early age. He developed symptoms of anxiety as a result of his severe

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT-5**
Case No. 2:16-cv-01904 JCC

**THE WOOD LAW FIRM, PLLC**
800 Fifth Avenue, Suite 4100
Seattle, WA 98104
206-447-1342; 206-577-5380 (fax)

1    OCD.  PRE_BER001254-1258.

2         15.    After years of treatment, without success, including inpatient admissions, M.B.'s

3    therapist referred Peter B. and his wife to an educational specialist for assistance in locating an

4    appropriate program for M.B. PRE_BER001278.

5         16.    M.B. was admitted at Second Nature, wilderness treatment program in Utah, on

6    September 30, 2014.  Following assessment, he was diagnosed with "Persistent Depressive Disorder,

7    Moderate, With anxious distress" in addition to the Autism and OCD diagnoses.  PRE_BER000278.

8         17.    During his stay at Second Nature, M.B. experienced some improvement in his

9    symptoms and behavior demonstrating increased accountability, ability to better manage his emotions,

10   as well as the improvement in communication and social interactions, but "his OCD remained

11   pervasive and problematic, requiring ongoing treatment." PRE_BER000279.

12        18.    On January 1, 2015, M.B. was discharged from Second Nature still at "risk for

13   relapsing in the areas of debilitating OCD, social difficulties, and depression if he were to return to his

14   home environment after completing [Second Nature's] program." PRE_BER000280.

15        19.    The Second Nature Discharge Summary "strongly recommended" that: [M.B.] go

16   directly from Second Nature to his next placement. Returning home, even for a few days, would place

17   him at great risk for a regression in functioning and would undo much of the progress that he has made

18   at Second Nature. *Id.*

19        20.    M.B. was admitted to Daniels Academy ("DA") on January 1, 2015, and the Initial

20   Treatment Plan was developed one day after his admission. PRE_BER000471.

21        21.    In the Initial Treatment Plan DA listed severe ongoing anxiety and OCD symptoms,

22   history of physical aggression towards parents and family pets, destruction of family property and

23   history of verbally abusive behavior towards all family members as reasons for M.B.'s admission for

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT-6**
Case No. 2:16-cv-01904 JCC

**THE WOOD LAW FIRM, PLLC**
800 Fifth Avenue, Suite 4100
Seattle, WA 98104
206-447-1342; 206-577-5380 (fax)

1  the treatment. *Id.*

2  22.  On January 2, 2015, DA performed a psychosocial assessment of M.B. and noted that

3  M.B. demonstrated willingness to change but lacks skills to realize that goal and "will require

4  consistent skill development processes which Daniels Academy is capable [of] providing over

5  time…[t]hough [M.B.] has made progress the rigid and slow response to therapy and limited progress

6  to therapy is an indicator that [he] needs continued support."   PRE_BER000472.

7  23.  DA developed a Master Treatment Plan on January 30, 2015, identifying that M.B.

8  suffers from severe ongoing anxiety and obsessive-compulsive disorder, and providing that M.B. will

9  be discharged from DA when he meets his goals "at a 90% level sustained for 3 to 6 months."

10  PRE_BER000537.

11  24.  While at DA M.B. participated in individual, group and family therapy.

12  PRE_BER001196, 1197, 1198.

13  **Claims and Appeal Process**

14  25.  While M.B. was still being treated at DA, claims for his treatment were submitted, and

15  on March 11, 2015, PBC denied covering residential treatment services after March 11, 2015. PBC

16  reasoned that according to the Plan residential treatment is medically necessary "only when the plan is

17  to stabilize your difficulties in a short term stay, usually approximately 90 days or less, and then

18  transfer to another level of care." PRE_BER001377.

19  26.  The March 11, 2015, denial letter also provides that the Plan considers continued

20  residential treatment medically necessary "only when discharge planning is started early in the stay

21  and continues during the stay until completed. Therefore, continued residential treatment to treat a

22  mental health condition is not medically necessary after 3/11/15." *Id.*

23  27.  Peter B. appealed the denial on September 3, 2015, arguing that the Utilization Medical

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT-7**
Case No. 2:16-cv-01904 JCC

**THE WOOD LAW FIRM, PLLC**
800 Fifth Avenue, Suite 4100
Seattle, WA 98104
206-447-1342; 206-577-5380 (fax)

1   Guideline ("UMG") PBC utilized to determine medical necessity of M.B.'s treatment was superseded

2   by the 2015 SPD, that does not have "any exclusions, limitations or restrictions on mental health and

3   substance abuse care." PRE_BER000046.

4        28.    Peter B. argued that the Plan's criteria for continued residential treatment contain no

5   reference to 90-day stay or necessity of discharge planning at the beginning of treatment as a condition

6   to continued stay. PRE_BER000048.

7        29.    Peter B. also listed the Plan's residential treatment continued stay criteria trying to

8   understand of PBC' denial and the criteria, but found nothing that would explain and justify PBC's

9   denial. *Id.*

10        30.    In the September 3, 2015 appeal, Peter B. provided detailed history of M.B.'s

11   development and behavior beginning when M.B. was two years old leading to M.B.'s admission at DA

12   at the age of 15. PRE_BER000054-66.

13        31.    M.B.'s symptoms deteriorated to the point where he became danger to himself and his

14   family, punching and grabbing his mother numerous times leaving her bruised, threatening to kill

15   himself and his parents, kicking family dogs and destroying family property. *Id.*

16        32.    In the appeal, Peter B. included the letter from Peter Weiss, MA, LMHC, dated August

17   6, 2015, who treated M.B. for nine months asserting that M.B. "had a particularly severe case" of

18   obsessive-compulsive disorder manifesting in aggressive behavior which resulted in "[s]hort term

19   inpatient stays at a local   pediatric psychiatric hospital." Because the inpatient treatment was not

20   helpful, Mr. Weiss refereed M.B.'s parents to an educational consultant, which recommended

21   "therapeutic/residential level of support for M.B. PRE_BER000495.

22        33.    Peter B. also included the letter from Douglas W. Maughan, LCMHC, M.B.'s primary

23   therapist at DA, dated August 11, 2015. M.B.'s therapist concluded that "[i]n order for M.B. to be

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT-8**
Case No. 2:16-cv-01904 JCC

**THE WOOD LAW FIRM, PLLC**
800 Fifth Avenue, Suite 4100
Seattle, WA 98104
206-447-1342; 206-577-5380 (fax)

1  functional in society he needs to be able to learn skills to address his functional deficits…[and]

2  consistency needed to ensure skill development progression can only be provided in a highly

3  structured environment." PRE_BER000492.

4      34.    The appeal letter included M.B.'s selected medical records from DA and Peter B's

5  request to PBC to provide in its response "internal statistical data on the average number of days

6  [PBC] authorizes for residential and inpatient treatment." Peter B. wrote: "It is important for me to

7  understand why your reviewer is disallowing [M.B.]'s care after a mere two months of treatment."

8  PRE_BER000069.

9      35.    Peter B. also asked PBC to include in its response specific references to M.B.'s medical

10  records that would support medical necessity determination and specific rationale for PBC's decision.

11  PRE_BER000073-74.

12      36.    PBC responded on October 2, 2015, upholding the denial and reasoning that the

13  treatment was not medically necessary "due to the fact that the patient has not shown evidence of

14  consistent improvement in the time he has been in this residential setting." PRE_BER000033.

15      37.    In upholding the denial PBC relied on Medical Review Institute of America, Inc.

16  ("MRIoA") review, which recommended that the standard of care for M.B. " would be the same type

17  of long term placement that would provide supervision while also providing ongoing outpatient

18  therapy and medication management." MRIoA review concluded that M.B. would not be able to return

19  home considering his condition and behavioral history and that he "needs supervision and structure to

20  assist him in his daily activities." PRE_BER000040.

21      38.    In its October 2, 2015, denial PBC did not respond to Peter B.'s request for the average

22  number of days PBC covers for residential treatment, nor did PBC provide elaboration or reference to

23  any specific medical record to show that M.B. has not responded to the treatment at DA.

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT-9**    **THE WOOD LAW FIRM, PLLC**
Case No. 2:16-cv-01904 JCC    800 Fifth Avenue, Suite 4100
Seattle, WA 98104
206-447-1342; 206-577-5380 (fax)

1    PRE_BER000033-43.

2        39.    On January 28, 2016, Peter B. requested an external review of PBC's denial, while

3    M.B. was still in treatment. PRE_BER000011.

4        40.    In his request Peter B. argued that the Plan's criteria are ambiguous and not in

5    accordance with generally accepted standards of medical practice. He argued that PBC's denial of

6    coverage for M.B.'s treatment is equivalent to refusing to cover treatment for a patient who is in the

7    midst of cancer treatment, which is "unethical, against provisions of the Mental Health Parity Law and

8    is prejudicial to people diagnosed with mental illness." PRE_BER000013-15.

9        41.    Peter B. included medical records in his request to demonstrate progress M.B. made

10   during the treatment, providing also excerpts from medical journal articles describing "diagnostic

11   challenges" in differentiating comorbid psychiatric disorders and autism spectrum disorders to point

12   out that PBC could not easily conclude that the residential treatment was not beneficial or that the

13   continued treatment will not be beneficial to M.B. PRE_BER000016.

14       42.    Peter B. argued that PBC's determination about effectiveness of M.B.'s treatment was

15   made prematurely, after less than three months of treatment and that PBC did not provide any clinical

16   evidence to support its conclusion, which is a violation of ERISA's requirements. PRE_BER000017-

17   18.

18       43.    The request included M.B.'s medical records demonstrating the progress he made while

19   in therapy at DA. Peter B. also included the family's observations and specific examples of the

20   positive difference in M.B.'s behavior since he started the treatment at DA. PRE_BER000018-27.

21       44.    Peter B. provided a record of one of M.B.'s therapy sessions as an example of M.B.'s

22   progress and his strong desire to improve. At that particular session M.B. was asked to explain how is

23   he different from a friend at DA who refused to participate in the DA's program and left: "The

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT-10**
Case No. 2:16-cv-01904 JCC

**THE WOOD LAW FIRM, PLLC**
800 Fifth Avenue, Suite 4100
Seattle, WA 98104
206-447-1342; 206-577-5380 (fax)

1    difference is that, even though I keep falling down, I always rise back up. I am not afraid to do hard

2    things." PRE_BER000028.

3          45.      In his external review request, Peter B. asked that the reviewer address ERISA and the

4    Mental Health Parity Act violations and consider clinical evidence provided that M.B.'s treatment was

5    medically necessary and that he has and is making progress. PRE_BER000029.

6          46.      Peter B. included a letter from Douglas Maughan, M.B.'s therapist, dated January 23,

7    2016, in which Mr. Maughan described the areas in which M.B. made progress at DA.

8    PRE_BER000692-693.

9          47.      On December 2, 2016, Advanced Medical Reviews ("AMR") issued a final report

10   upholding the PBC's denial of coverage. PRE_BER000934.

11         48.      In its final denial, AMR ignored all the arguments about the Mental Health Parity Act,

12   ERISA violations, M.B.'s therapist's opinion, family observations about M.B.'s improvement, and

13   other information provided in Peter B.'s appeals. Instead, AMR laid out the Residential Acute Level of

14   Care admission criteria concluding that the criteria were not met. However, these were the wrong

15   criteria to apply in evaluating M.B.'s case. PRE_BER000935-939.

16                                          **ARGUMENT**

17
18   **I.     THE COURT SHOULD APPLY A *DE NOVO* STANDARD OF REVIEW**
19
20         A denial of benefits under any ERISA plan calls for a de *novo* standard of review unless the

21   plan-governing document grants discretionary authority to a plan administrator to interpret the terms

22   of the plan and determine eligibility for benefits under the plan. *Firestone Tire & Rubber Co. v. Bruch*,

23   489 U.S. 101, 115 (1989). If a plan administrator is granted such authority by the plan's governing

24   document, any challenge to a denial of benefits under the plan must be reviewed under a deferential

25   abuse of discretion standard where the court determines whether a decision to deny benefits was

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT-11**          **THE WOOD LAW FIRM, PLLC**
Case No. 2:16-cv-01904 JCC                              800 Fifth Avenue, Suite 4100
                                                        Seattle, WA 98104
                                                        206-447-1342; 206-577-5380 (fax)

1    arbitrary and capricious. *Rush Prudential HMO v. Moran*, 536 U.S. 355, 385-86 (2002). The default

2    standard of review in ERISA claims is therefore a de *novo* and "that the administrator has no

3    discretion, and the administrator has to show that the plan gives it discretionary authority in order to

4    get any judicial deference to its decision." *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089 (9th Cir.

5    1999).

6            There is no governing document for the Plan in the administrative record before this Court

7    containing language giving PBC discretionary authority to interpret the terms of the Plan. "If a court

8    reviews the administrator's decision, whether de novo [], or for abuse of discretion, the record that was

9    before the administrator furnishes the primary basis for review." *Kearney* at 1090.

10           The administrative record does include copies of the 2015 and 2016 SPDs. PRE_BER000743-

11   953. In *CIGNA Corp v. Amara*, 563 U.S. 421, 436-438 (2011), the Supreme Court has made clear that

12   SPDs are, by definition, summaries of the governing plan documents, not the governing plan

13   documents themselves. Courts across the country have wrestled with interpreting *Amara*, and, in most

14   cases, the pressing issue isn't whether or not the SPD alone is enforceable. It is whether the SPD is

15   properly incorporated by the master Plan document, whether or not the terms of the SPD conflict with

16   the terms of the master Plan, and whether the SPD is the only governing plan document. *See, e.g.,*

17   *Tetreault v. Reliance Standard Ins. Co.*, 769 F.3d 49 (1st Cir. 2014); *Mead v. Reliastar Life Ins. Co.*,

18   2015 U.S. Dist. LEXIS 89581; *Board of Trustees v. Moore*, 800 F.3d 214, 220 (6th Cir. 2015); and

19   *Prichard v. Metropolitan Life Ins. Co.,* 783 F.3d 1166, 1170 (9th Cir. 2015).

20           In interpreting *Amara,* the Ninth Circuit acknowledged that there are situations when an

21   ERISA plan asserts that the SPD is incorporated by the master plan document and have not decided

22   whether to take a   "consolidated approach." However, there is nothing in the record that shows that

23   the SPDs are part of the master Plan. *Prichard* at 1169. Even if the Court accepts the possibility that

1   the SPDs in the record were incorporated in the master Plan, there is no discretionary language in the

2   SPDs that would grant discretionary authority to PBC.

3        The Record includes no governing plan documents that include discretionary authority

4   language, and, as a result, under *Amara* there is no governing Plan document language that triggers an

5   abuse of discretion standard of review. The standard of review for Peter B.'s claim therefore is *de*

6   *novo*.

7        Further, there is nothing in the Record to indicate who the Plan administrator is or that the Plan

8   administrator was involved to any extent in making decisions about Peter B.'s claims and, as a result,

9   there is no discretionary decision to which this Court can defer. In addition, because the governing

10   Plan document is not before the Court there is no ability for the Court to review the terms of the

11   governing plan document to verify that the SPDs accurately reflect the terms of that document or

12   documents. This Court has no way of knowing whether (1) the terms of the SPDs conflict with the

13   master Plan document or (2) the terms of the SPDs are authorized by, or reflected in, the master Plan.

14        Without an opportunity to review the governing master Plan document(s) for this Court to

15   verify that PBC had discretionary authority, the SPDs may not be enforced as containing the terms of

16   the ERISA benefit Plan at issue in this case. *Prichard,* 783 F.3d at 1171. The Court should review

17   Peter B.'s claims for reimbursement of M.B.'s medical expenses under a *de novo* standard of review.

## II.    THE TERMS OF THE PLAN DID NOT JUSTIFY PBC'S DENIAL OF COVERAGE FOR M.B.'S RESIDENTIAL TREATMENT AT DA

21        Peter B. argued in his appeal that PBC applied the wrong criteria that were not part of the Plan

22   when PBC evaluated necessity of M.B.'s continuous stay at DA, and ultimately denied coverage for

23   treatment received. M.B. was admitted to DA on January 1, 2015, after a short treatment at Second

24   Nature's wilderness program. PRE_BER000278. The severity of M.B.'s symptoms necessitated

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT-13**
Case No. 2:16-cv-01904 JCC

**THE WOOD LAW FIRM, PLLC**
800 Fifth Avenue, Suite 4100
Seattle, WA 98104
206-447-1342; 206-577-5380 (fax)

1    continued treatment and that was apparent in the Discharge Summary from Second Nature when

2    M.B.'s primary therapist expressed his concern that M.B. was "at great risk for a regression" if he does

3    not receive continuous treatment and strongly recommended that M.B. continue therapy.

4    PRE_BER000280. PBC provided coverage for services provided through March 11, 2015, and refused

5    to cover any treatment after that date stating the following:

6    > The treatment guidelines used by your health plan state that continued residential treatment to
7    > treat a mental health condition is **medically necessary only when the plan is to stabilize your**
8    > **difficulties in a short term stay, usually approximately 90 days or less**, and then transfer to
9    > another level of care. Your provider is stating that your stay is expected to be 14 months, which
10   > is not considered to be a short-term stay. The treatment guidelines used by your health plan
11   > also state that continued residential treatment to treat a mental health condition is **medically**
12   > **necessary only when discharge planning is started early in the stay and continues during**
13   > **the stay until completed.** The information from your provider does not show that discharge
14   > planning is taking place or has been completed. Therefore, continued residential treatment to
15   > treat mental health condition is medically necessary after 3/11/15.

17   PRE_BER001002 (emphasis added).

19   The fact that PBC paid for M.B.'s treatment through March 11, 2015, demonstrates that PBC

20   did not contest that M.B. met the Plan's admission criteria for residential treatment. Because M.B. was

21   already in treatment when PBC refused to cover the rest of his treatment at DA, the Plan's residential

22   treatment criteria for underlined_continued applied to evaluate the medical necessity of the continued

23   treatment. In the Plan's continued stay criteria there is no reference to the 90-day stay limitation for

24   residential treatment. PRE_BER000744-748.

25   The PBC also justified the denial with the assertion that "your provider does not show that

26   discharge planning is taking place or has been completed." PRE_BER001002. The Plan's Intensity of

27   Service Criteria require that "[a]n initial discharge plan must be formulated within seven days of

28   admission." PRE_BER000747. In addition, the same criteria require that subsequent to developing an

29   initial discharge plan "active, appropriate, realistic, comprehensive discharge planning must be

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT-14**
Case No. 2:16-cv-01904 JCC

**THE WOOD LAW FIRM, PLLC**
800 Fifth Avenue, Suite 4100
Seattle, WA 98104
206-447-1342; 206-577-5380 (fax)

1    initiated...and must continue throughout the residential stay until completed." *Id*.

2    On January 2, 2015, one day after M.B.'s admission, DA developed an Initial Treatment Plan,

3    which evolved into a Master Treatment Plan on January 30, 2015. PRE_BER001249, 001199. PBC

4    cannot ignore the fact that DA's Initial Treatment Plan represented initiation of the discharge planning

5    process. The Plan's language regarding discharge planning indicates that the Plan realized that it

6    would be impossible to develop a complete discharge plan early in the treatment and thus the Plan

7    required that the discharge planning continue throughout the treatment until completed.

8    PRE_BER000747. The Plan also requires the discharge plan to be "appropriate" and "realistic." *Id*. It

9    would have been difficult for DA to develop an appropriate and realistic discharge plan without first

10   assessing and evaluating M.B.'s condition.

11   The Discharge Planning section of the Master Treatment Plan provided that M.B. would be

12   discharged from DA "when he has been able to meet his goals outlined below at a 90% level sustained

13   for 3 to 6 months." PRE_BER001199. It was therefore wrong for PBC to conclude that that DA did

14   not initiate planning for M.B.'s discharge at the beginning of his treatment. PRE_BER001002.

15   Moreover, there was no mention of the 90-day limitation in the Plan's continued stay criteria.

16   The Plan provides that a covered service or supply is medically necessary if, among other

17   things, "[i]t is appropriate for the medical condition as specified in accordance with authoritative

18   medical or scientific literature and generally accepted standards of medical practice."

19   PRE_BER001022.  It would be hard to reconcile the 90-day limitation treatment at a residential

20   treatment facility with the nature of residential treatment, which is defined as a level of sub-acute, non-

21   hospital, inpatient care. *Harlick v. Blue Shield of California*, 686 F.3d 699, 709 (9th Cir. 2012). It is

22   sometimes referred to as "intermediate" care.  https://www.magellanprovider.com/

23   media/1771/mnc.pdf, pp. v-vi (last viewed 9/05/17). It is often provided to adolescents who have

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT-15**
Case No. 2:16-cv-01904 JCC

**THE WOOD LAW FIRM, PLLC**
800 Fifth Avenue, Suite 4100
Seattle, WA 98104
206-447-1342; 206-577-5380 (fax)

1   mental illness or substance abuse problems that are not so severe as to require acute inpatient care, but

2   are serious enough to require more than outpatient care. The average length of stay for adolescents is

3   seven to twelve months. http://store.samhsa.gov/shin/content/SMA06-4167/SMA06-4167.pdf, p. 20,

4   Table III.4 (last viewed 9/05/17).

5          If the Plan provides coverage for services that are in accordance with generally accepted

6   standards of medical practice, discontinuing coverage for M.B.'s residential treatment was not in

7   accordance with the terms of the Plan. Because there was no 90-day limitation in the Plan's continued

8   stay criteria and PBC incorrectly concluded that DA did not initiate the discharge planning early in the

9   treatment, PBC's reasons for denial have no support in the terms of the Plan. Furthermore,

10  discontinuing residential treatment at an early stage goes not only against generally accepted standards

11  of medical practice, which recommend significantly longer treatment, but against the terms of the Plan

12  as well. Therefore this Court should reverse denial of coverage for M.B.'s residential treatment at DA.

13  **III.   PBC'S CONSTANT SHIFTING OF THE REASONS FOR THE DENIAL OF**
14  **M.B.'S RESIDENTIAL TREATMENT INDICATES THAT THE DENIAL WAS**
15  **ARBITRARY AND CAPRICOUS**
16
17         When PBC originally declined to cover M.B.'s residential treatment on March 11, 2015, it

18  reasoned that the treatment was not medically necessary because a "**treatment to treat mental health**

19  **condition is medically necessary only when the plan is to stabilize your difficulties in a short-**

20  **term stay, usually approximately 90 days or less**," and "**only when discharge planning is started**

21  **early in the stay and continues during the stay until completed**." PRE_BER001377 (emphasis

22  added).

23         After Peter B. appealed the denial on September 3, 2015, arguing that the Plan's continuous

24  residential treatment criteria do not contain any reference to the 90-day stay limitation and asking PBC

25  to include in its response specific references M.B.'s medical records supporting the lack of medical

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT-16**     **THE WOOD LAW FIRM, PLLC**
Case No. 2:16-cv-01904 JCC     800 Fifth Avenue, Suite 4100
Seattle, WA 98104
206-447-1342; 206-577-5380 (fax)

necessity determination, PBC responded on October 2, 2015, arguing that the denial was proper because "**due to the fact that the patient has not shown evidence of consistent improvement in the time he has been in this residential setting.**" PRE_BER000033 (emphasis added).

On January 28, 2016, Peter B. requested an external review of PBC's denial, and on December 2, 2016, AMR issued the final report upholding the PBC's denial of coverage referring to the MCG Guidelines for Residential Acute Behavioral Health Level of Care, Child or Adolescent criteria. PRE_BER000938. It is apparent that AMR utilized improper criteria because the terms such as "imminent danger to self," or "imminent danger to others," are not part of the residential treatment continued stay criteria. PRE_BER000938, 001392-001396. AMR also reasoned that M.B. did not exhibit "[s]evere psychiatric symptoms [] (eg. hallucinations, delusions, other acute psychotic symptoms, mania, severe autistic behaviors). [sic] [not met from 3/12/15 onwards, as **there was no documented psychosis, mania, or severe autistic behaviors….**]" PRE_BER000938.

In sum, Peter B. received three denials of coverage for M.B.'s residential treatment, each of them containing a different rationale for why M.B.'s residential treatment at DA was not medically necessary.

The Ninth Circuit has held that "[t]he continual shifting of the plan's grounds for denial [] suggest abuse of discretion. *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 679 (9th Cir. 2011). In *Collins v. Liberty Life Assur. Co.*, 988 F.Supp.2d 1105, 1130 (C.D. Cal. 2011), the court expressed the same conclusion when it held:

> [The] shifting rationales provide some evidence that [insurance provider] desired a certain result and summoned up various rationales to reach it. This type of self-interested decision-making contravenes the purpose of ERISA and is the essence of an abuse of an insurance provider's discretion.

The adverse effect of changing rationale in the benefit determination process is especially

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**-17
Case No. 2:16-cv-01904 JCC

**THE WOOD LAW FIRM, PLLC**
800 Fifth Avenue, Suite 4100
Seattle, WA 98104
206-447-1342; 206-577-5380 (fax)

1   apparent when the denial rationale is changed in the final appeal, when there is no opportunity to

2   respond and offer counterarguments. The Ninth Circuit addressed that issue as well:

3       [W]e have held that an administrator may not raise a new reason for denying benefits in its
4       final decision because that would effectively preclude the participant 'from responding to that
5       rationale for denial at the administrative level,' and insulate the rationale from administrative
6       review.

7

8   *Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945 (9th Cir. 2014) (citing *Abatie v. Alta Health &*

9   *Life Ins. Co.*, 458 F.3d 955, 974 (9th Cir 2006) (en banc)).

10      That is exactly what happened in this case. After the final AMR review, Peter B. had exhausted

11  his administrative remedies and he no longer had an opportunity to respond to the latest and

12  substantially different rationale for the denial. PBC's behavior in this case demonstrates that PBC was

13  bent on denial of M.B.'s claims regardless of validity of Peter B.'s arguments that M.B.'s treatment

14  should have been covered. *Friedrich v. Intel Corp.*, 181 F.3d 1105, 1110 (9th Cir. 1999).

15      It is especially troublesome that AMR's report was based on an analysis of the acute inpatient

16  criteria, generally utilized to determine whether there is a need for psychiatric hospitalization. The fact

17  that the AMR reviewer analyzed M.B.'s case under those criteria, concluding that because M.B. did

18  not have psychosis, hallucinations, delusions and mania and "based on the evidenc+e-based literature,

19  the Residential Treatment Center dated 03/12/15 – current [sic] is not medically necessary" indicates

20  that the reviewer did not understand the difference between acute and sub-acute levels of care.

21  PRE_BER000939. PBC should not be allowed to change the rationale every time it reviews an appeal

22  of a denial of benefits. As the *Collins* court concluded, such practice contravenes the purpose of

23  ERISA, and this Court, as its guardian should preclude such practice by reversing PBC's denial of

24  M.B.'s residential treatment at DA.

25
26

**IV.    PBC ENGAGED IN NUMEROUS ERISA CLAIM PROCEDURES    VIOLATIONS CALLING FOR THE REVERSAL OF THE DENIAL OF COVERAGE**

The procedural irregularities in PBC's handling of Peter B.'s claim for coverage of M.B.'s residential treatment were so numerous and significant in demonstrating violations of ERISA's claims procedure regulations that they prove PBC did not provide a full and fair review as required by ERISA.  As such, the claim denial should be reversed.

29 U.S.C. §1133 requires that ERISA plans:

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> (2) afford a reasonable opportunity to any participant who claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

This section of ERISA, titled "Claims Procedure," is fleshed out by the terms of 29 C.F.R. §2560.503-1, ERISA's claims procedure regulations.  In *Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1463 the Ninth Circuit stated:

> In simple English, what this regulation calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries . . . There is nothing extraordinary about this: it is how civilized people communicate with each other regarding important matters.

A brief review of Peter B.'s appeal letters demonstrate a great deal of time and effort Peter B. invested in trying to communicate and present M.B.'s history to PBC to show how much in need he was of the residential treatment he received at DA. The amount of detail Peter B. presented in the letters reveals a parent trying to get help for a child who is in desperate need of such help. An example of that is Peter B.'s appeal to PBC's second denial based on M.B.'s apparent lack of "consistent improvement in the time he has been in [the] residential setting." PRE_BER000033. In his January 28, 2016, response and request for an external review, Peter B. provided extensive analysis of diagnostic

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT-19**
Case No. 2:16-cv-01904 JCC

**THE WOOD LAW FIRM, PLLC**
800 Fifth Avenue, Suite 4100
Seattle, WA 98104
206-447-1342; 206-577-5380 (fax)

1   difficulties to differentiate symptoms when there are multiple disorders present, included medical

2   records and family observations demonstrating how much M.B.'s condition improved after he started

3   treatment at DA. PRE_BER000015-28. The final denial Peter B. received on December 2, 2016,

4   lacked any meaningful response to his arguments. Instead, the reviewer selectively picked two

5   instances from M.B.'s treatment history to demonstrate that M.B. had not shown sufficient progress to

6   remain in treatment, and analyzed M.B.'s condition under "Admission to Residential Acute Level of

7   Care" criteria as discussed *supra*. In *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d

8   863, the Ninth Circuit restated the importance of a meaningful dialogue as discussed in *Booton*  when

9   concluding  that "communications with Saffon and her doctors are hardly a model of clarity; they

10  certainly do not explain "in a manner calculated to be understood by the claimant." *Id*. at 870.

11          PBC's shifting of rationales for the denial of coverage M.B.'s, coupled with PBC's failure to

12  provide adequate explanation of the denial rationales and respond to the information and arguments

13  Peter B. provided in his appeal, constitute substantial violation of ERISA claim procedures and call for

14  reversal of the denial.

> An administrator must provide a plan participant with adequate notice of the reasons for denial, 29 U.S.C. § 1133(1), and must provide a **"full and fair review" of the participant's claim**, *id.* § 1133(2); *see also* 29 C.F.R. § 2560.503-1(g)(1), (h)(2). **When an administrator tacks on a new reason for denying benefits in a final decision, thereby precluding the plan participant from responding to that rationale for denial at the administrative level, the administrator violates ERISA's procedures**. "[S]ection 1133 requires an administrator to provide **review of the specific ground for an adverse benefits decision."** *Robinson*, 443 F.3d at 393. By requiring that an administrator notify a claimant of the reasons for the administrator's decisions, the statute suggests that the specific reasons provided must be reviewed at the administrative level. *Id.* Moreover, a **review of the reasons provided by the administrator allows for a full and fair review of the denial decision, also required under ERISA**. *Id.* Accordingly, an administrator that adds, in its final decision, a new reason for denial, a maneuver that has the effect of insulating the rationale from review, contravenes the purpose of ERISA. This procedural violation must be weighed by the district court in deciding whether Alta abused its discretion.

*Abatie* at 974 (emphasis added).

1    PBC's failure to engage in a meaningful dialogue with Peter B. during the appeal process and

2    actually consider and respond to the points raised in his appeals violates both PBC's and the Plan's

3    fiduciary duty to them and the claims procedure regulations underlying ERISA. PBC failed to provide

4    a full and fair review of the claim as required under ERISA, 29 C.F.R. §2560.503-1(h)(2)(iv) when it

5    did not:

6        [p]rovide for a review that takes into account all comments, documents, records, and other
7        information submitted by the claimant relating to the claim, without regard to whether such
8        information was submitted or considered in the initial benefit determination.
9

10    PBC's denials did not address in any meaningful way the points raised by Peter B. for why the

11    residential treatment at DA was not an appropriate treatment option for M.B., nor did they comment in

12    any way on the materials Peter B. included in his appeals. With three different rationales provided for

13    the denial of coverage, Peter B. can hardly say that PBC's afforded him a full and fair review of his

14    claim. This Court should remedy PBC's violations of ERISA claims procedures and PBC's denial of

15    coverage for M.B.'s treatment at DA, by reversing the claim denial and ordering payment of benefits

16    for M.B.'s care.

17    **V.    THE PLAINTIFFS ARE ENTITLED TO AN AWARD OF ATTORNEY FEES AND**
18    **        COSTS UNDER 29 U.S.C. §1132(g)**
19

20    In the event that the Court grants Peter B.'s Motion for Summary Judgment, he requests an

21    award of attorney fees and costs based on 29 U.S.C. §1132(g) and pursuant to *Hardt v. Reliance*

22    *Standard Life Ins. Co.*, 560 U.S. 242 (2010), as the prevailing party in this litigation. Peter B.

23    requests the opportunity to present in future briefing additional information demonstrating why an

24    award of prejudgment interest, attorney fees, and costs is appropriate.

25

1    Dated this 20th day of September, 2017.

2

3        /s/ Brian S. King
4        Brian S. King (admitted *pro hac vice*)
5        BRIAN S. KING, P.C.
6        336 South 300 East, Suite 200
7        Salt Lake City, UT 84111
8        (801) 532-1739 (telephone)
9        (801) 560-0769 (cell)
10       brian@briansking.com

11

12       John Walker Wood (WSBA #39120)
13       The Wood Law Firm, PLLC
14       800 5th Avenue, Suite 4100
15       Seattle, WA 98104
16       (206) 447-1342 (telephone)
17       (206) 650-0765 (cell)
18       (206) 577-5380 (facsimile)
19       john@woodfirm.com

20       Attorneys for Plaintiff

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT-22**
Case No. 2:16-cv-01904 JCC

**THE WOOD LAW FIRM, PLLC**
800 Fifth Avenue, Suite 4100
Seattle, WA 98104
206-447-1342; 206-577-5380 (fax)

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on the 20th day of September, 2017, the foregoing document was presented to the Clerk of the Court for filing and unloading to the CM/ECF system. In accordance with the ECF registration agreement and the Court's rules, the Clerk of the Court will send email notification of such filing to the following:

Gwendolyn C. Payton
Kilpatrick Townsend & Stockton LLP
Suite 3700, 1420 Fifth Avenue
Seattle, WA 98101
(206) 626-7714
(206) 299-0414
GPayton@kilpatricktownsend.com

Dated this 20th day of September, 2017.


                                        /s/ John Walker Wood
                                        John Walker Wood, WSBA #39120
                                        The Wood Law Firm, PLLC
                                        800 5th Ave, Ste 4100
                                        Seattle, WA 98104
                                        (206) 650-0765
                                        (206) 577-5380 (fax)
                                        john@woodfirm.com

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT-23
Case No. 2:16-cv-01904 JCC

THE WOOD LAW FIRM, PLLC
800 Fifth Avenue, Suite 4100
Seattle, WA 98104
206-447-1342; 206-577-5380 (fax)